Good morning, Your Honor. May it please the Court, I'm Jeffrey Redfern from the Institute for Justice here on behalf of the appellant, Carlos Pena. I'd like to reserve three minutes for rebuttal. A few weeks ago, two justices of the Supreme Court issued a statement recognizing that the question in this case is one of first impression, deserving careful consideration from the lower courts. If there is a law enforcement exception to the Fifth Amendment, it has to come from somewhere in constitutional text or history, but the City of Los Angeles can't tell us where. Well, counsel, I'm going to push back on that a little because I think that before you would even get to that question, you would have to answer the question of does the conduct that's alleged here even come within the meaning of the takings or just compensation clause of the Fifth Amendment? If it doesn't come within the meaning pursuant to history and original public meaning, they don't have to show an exception. Yeah, I think that's pretty straightforward, Your Honor. It goes in the Supreme Court at least back to Pompeli when the government physically invades property such that it destroys it and deprives a property owner of use and enjoyment. So correct me if I'm wrong, counsel. First, in Pompeli, the Supreme Court was interpreting the Constitution of the state of Wisconsin, correct? Yes, and it said that it was the same as the federal Constitution. But it was interpreting that and then it said, where real estate is actually invaded by super-induced additions of water, earth, sand, or other material, or by having any artificial structure so as to effectively destroy or impair its usefulness, it is a taking. Beyond this, we do not go, and this case calls us to go no further. That's the holding, right? Right, and I think that applies to this case exactly. It was really the tear gas that did this damage. It was foreign material. Go ahead. Go ahead. They launched foreign material into my client's shop that saturated and destroyed his equipment so that its usefulness was completely destroyed. His printers are in a landfill now and he can't use them. And the Supreme Court has over and over again reaffirmed Pompeli. So it's not just limited to the Wisconsin Constitution. They've reaffirmed it as recently as Arkansas Game and Fish. But you're saying that in the separate statement, the two justices said the question of whether damage reasonably incurred in the capturing of a fugitive who's a danger to public safety is a question of first impression? Yeah, that specific question has not been answered. But I do think that history is very instructive because we have all of these cases dealing with public necessity from the 19th century. We've got cases in our brief from the 1830s, 40s, and 50s. And they all say that if the government is tearing down your house to create a fire break or to stop a pestilence, the individual officers who are doing this destruction, they are protected. They have an individual tort immunity, but that doesn't get imputed to the takings clause. Mr. Redburn, I'm trying to understand your position here. If the SWAT team had simply used the battering ram and did not deploy any gas and destroyed only Mr. Pena's shop door, would that be a taking under your theory? I think it would, Your Honor. But if the government in a future case wants to argue that there's some sort of de minimis exception for a splinter door jam, that's a fight we can have down the road. I think that the model for how to decide this case really, I think, is Arkansas game and fish. The Supreme Court there was looking at a lower court decision that had drastically over read dicta in its prior cases and created this categorical exception to the Fifth Amendment. And all the Supreme Court did in that case was say, we reject that categorical exception. Anything that's open on remand, you can still argue. In future cases, you can argue for narrower exceptions. Counsel, your test proposes whenever the government caused property damage intentionally foreseeably or foreseeably for any public benefit, the government has to pay, right? That's right. Okay. So let me give you a hypothetical, slightly different than what happened in this case. That test would be applicable if the fugitive here were holding a hostage, right? I think that if the fugitive were holding a hostage and say the hostage were inside their own property, then probably the YMCA doctrine would apply. Yeah, but if the fugitive were holding a hostage that wasn't the owner of the damaged property, government would have to pay. That's right. Or if the fugitive were holding an explosive. That's right. Or if the fugitive, to take some facts from a very old Supreme Court case, were putting somebody in a coffin under the ground where they had an hour of an air supply and the government were rescuing them, your test would say compensate. It would. And I think the problem with all of these hypotheticals is that all of them ask, does the government have a really good reason for taking property? And you can look at all of Supreme Court case law about the takings. It doesn't matter how good the reason is. You have to have a good reason to take it in the first place. But that presupposes that damaging property and the reasonable exercise of protecting the public is taking the property. But I understand you say it is. Would hypothetically, if there were a fire engine going down the street and there were a car in its way on the side that it legally parked, that it needed to move out of the way to put out of a fire and it damaged the car, that's compensable too, right? That's what City of New York v. Lord and Bishop v. Macon, all of these old 18th century cases, say that. It's the exact same case. If we have to destroy your property to stop a fire, that's going to be a taking. Unless your property would have been destroyed anyway, absent the firefighting activity. So if the blaze is rushing towards your house, that's an inevitable destruction case. And that's one of the things that Justices Sotomayor and Gorsuch flagged is different. One of Judge Bennett's typos was an explosive. I would have thought that would have fallen into the exception you were just discussing. Oh, I suppose it would then. Yeah. And those are going to be fact-intensive questions where the government is going to prove that it would have been destroyed anyway. But I think those are the kinds of case-by-case determinations that the Supreme Court is encouraging lower courts to make in Arkansas game and fish rather than falling back on these broad categorical exceptions. So a big theme in your brief is this quote from Armstrong about not having the government force particular people. Did we just lose Judge Tallman? Hold on. Can we stop the clock for a second and make sure we have Judge Tallman? And then I'll ask my question. We have lost Judge Tallman. I will work on getting him back.   Judges, Judge Tallman's chambers reports their building has lost power. They are working on reconnecting Judge via Wi-Fi and an iPad or something. I will continue working with them to help facilitate this. Would you like to possibly take a recess and go into the roving room? Sure. It sounds like this might take a few minutes, so why don't we do that? Okay. Thank you, judges. Here we go to the roving room. Kelly, can you hear me? Yes, we are still public audio. Judge Tallman says they lost power in the building. Yes, that is what I just reported to judges. Okay. Thank you. He wants to know if you can connect by video, I mean by phone. Yes, of course you can. I will send that information straight away. Okay, I'll let him know. Judge Tallman, they're sending over the information so you can plug in with your cell phone. Okay. Thank you, Judge. Okay. Okay. Okay. I've sent my teams to both Judge and Crystal. Okay. Okay. Okay. Hi, Judge, can you hear me? Yeah, I can hear you. Okay, I've got you on. I'm going to put you back into the roving room and I'll join you there and then we'll come back out into the courtroom. Okay, very good. The judges took a recess. I'm going to end this phone call. Yeah. Okay, Judge. Okay, I'm going to sign off. Okay, everyone, please stand by for resumption of court. Okay. Are we all back? I think we're all back. So I'll start my question over. So there's a big focus on Armstrong and the notion that the government shouldn't force some people alone to bear the burden of the cost of helping the public. Why shouldn't we view the situation here as the fugitive having chosen Mr. Pena to bear this burden rather than the government? Well, it was still the government's choice to cause the destruction and I don't think the takings clause asks about faults. If we took my house to build a jail, it could be the faults of the criminals that we have to house. It could have been absolutely necessary. Same thing in a war. If they need to take my horses to fight the British, it's the faults of the British. When you say in answer to Judge Friedland's question, the choice, first you've agreed the government did what was reasonable and necessary, right? Well, we agree that it was reasonable and lawful. We don't agree that it was- Okay, reasonable and lawful and if the government had, you would also agree that theoretically the government was faced with a situation where inaction or less action could have caused significantly more harm to individuals, right? That's possible. All right, go ahead. Okay, yeah, and I think the answer to that is just all of this history that we talk about in our brief. We've got the founding era declarations of rights that all say when it's necessary for the common preservation, for people to sacrifice their property, they get compensated. We've got cases from the 1830s and 40s, and we don't have any cases going the other way. This every time- I mean, part of the intuition though is that someone who does something that helps, someone who helps solve a problem, it should somehow get compensated. But it seems that if someone intrudes in your house and it causes damage, you can usually sue that person. So I'm just wondering if there needs to be government compensation, if the notion is that the intruder caused this problem, it was all a reasonable government reaction, so really the person liable should be the intruder who was the cause of this. Well, I don't think there's any way the intruder was going to destroy the shop like this. Certainly if the intruder did some damage, that wouldn't be something that the government has to could have claims against the intruder. They could have claims for restitution. They're probably not going to be able to recover. But I think that this is a common theme through these takings cases, that we don't look for fault. We just look, did the government cause the damage or take the property? So counsel, you're obviously familiar with Cedar Point. Yes. Okay. So in Cedar Point, where the Chief Justice was talking about background limitations that don't involve a taking and no compensation, is entering public or entering private property in the case of necessity, entry to avoid a disaster, entry to avoid serious harm, entry to, I believe, affect arrest or enforce the criminal law. So the court was saying, here you have these background principles, and even though entry itself is a taking, as it found in Cedar Point, it's still informed by these background principles where there's no compensation because it's not a taking. So why wouldn't we look at what the Supreme Court said in Cedar Point and say, this is a predicate to entry to avoid serious harm or the privilege to affect an arrest or enforce the criminal law and things that are connected with that? Why wouldn't we take why wouldn't we take what the government is saying here as an extension of those background principles the court identified in Cedar Point? So I think that that dicta has to be read in the context of the right that the court was talking about there. I think at least a dozen times the court refers to the right to exclude. And we wholeheartedly agree that a lawful search does not appropriate a property owner's right to exclude, which has never been absolute, but there was no damage in that case. And I think that- I would also say the Supreme Court has taken on occasion a dim view of our court characterizing what he had said as dicta. Well, I think actually the court takes the opposite view in Arkansas Game and Fish. What the federal circuit did in that case was expand dicta from prior Supreme Court takings cases to create a new exception that was about a totally different factual situation. And the Supreme Court said, don't do that. And I think one of the reasons not to read that dicta so broadly is that all of this history that we're talking about in our brief, that was not before the Supreme Court in Cedar Point. And if we were to read Cedar Point that broadly, then we have an irreconcilable conflict with the history because all of these 19th century cases go the other way on at least public necessity. And public necessity and law enforcement privilege were treated similarly by the Supreme Court there. I have one more question for you, counsel. You're familiar with the Bachman case? Yes. All right. So I think in 2017, the United States filed- the Department of Justice filed a motion to dismiss when it took the position that the complaint fails because the United States' valid exercise of its police power did not affect the taking. Are you aware of any more recent statement by the United States on this issue other than their motion to dismiss and the reply they filed in Bachman? I am not from the United States. All right. Thank you. I would note though that that police power exception has since been rejected by the fourth, fifth, sixth circuits. It's squarely at odds with century of Supreme Court precedent. So I don't think nobody is really going that direction anymore except some lower unreported trial court decisions. Well, they also said a government action for public safety is an exercise of the police power not taking. But in any case, you're not familiar, as you said, with a more recent statement by the United States. No. Counsel, are you familiar with the 2022 Supreme Court decision in Egbert versus Buell? That was a case dealing with whether or not we should recognize new causes of action under the Bivens Doctrine against federal law enforcement officers for torts committed within the course and scope of their employment. I'm not familiar with that case. The concern I have is the question of who decides this question that you are presenting to us today. In that case, the Supreme Court basically said that if the actions would result in the creation of a new cause of action under the Bivens Doctrine, that judges should ask themselves whether that the decider should be judges or whether the legislature would be in a better position to resolve the question of who And I'd like your thoughts with regard to whether or not there's an analogy here to Buell that the question very much needs to be resolved. But shouldn't this be left to Congress as opposed to the courts? No. So I think the question's already been answered. In Nick, the Supreme Court said, if you allege that your property has been taken and that you haven't been paid, you have a ripe 1983 cause of action. Congress created that for takings claims. Now, whether this is a taking or not is just a question of substantive law, but it's not a question of whether there's a cause of action. I would also note that Bivens has different concerns because that's about tort remedies for completed violations. And in a takings claim, the taking is not a violation. The violation is the refusal to compensate. But I don't think there's any question that we have a 1983 cause of action for the takings claim here. Judge Friedland, would it be okay if I asked one more question? I know I've taken up- I was going to say, I have more questions too. So we will still give you three minutes for rebuttal, but just keep answering our questions as long as we ask them. All right. Thank you. Thank you, Judge Friedland. So sort of asking a different version of Judge Talman's question, a significant number of states have in fact addressed this exact question in their constitutions, right? Are you referring to the damagings clauses? Yes. Yeah. So that's actually not about this issue. Professor Molly Brady at Harvard published an article in 2018 in the University of Virginia Law Review about these. And she explains that actually damage caused by physical invasions was already understood to be compensable when these were adopted. They were essentially to constitutionalize the law of nuisance and loss of access from public works in the late 19th century when there was no physical intrusion. Although the actual language of the constitutions, for example, Minnesota, private property shall not be taken, destroyed, or damaged. Texas, no person's property shall be taken, damaged, or destroyed. California, private property may be taken or damaged, but only when you pay. So the language of those constitutions doesn't reflect what you've just said, right? I mean, it may be part of their history or not, but they all use the word, if it's damaged, they all use the word, if it's taken, you get money. If it's damaged, you get money. Right. And I would just encourage you to take a look at the article that goes into the constitutional history in a lot of detail. But I would note that all of these amendments post-date Pompeli. So it was already understood that under the Fifth Amendment, literal destruction of private property was covered. This was mostly about cases with street grading, where suddenly your front door would be five stories in the air and you needed to use a ladder, or if you're next to a railroad and there was smoke coming in, but the railroad itself didn't actually cross onto your property. Those were the cases that they were concerned about. My question was following up on the inevitability concept that you talked about earlier, like when you said that if someone was holding an explosive, that might actually fall under the exception if the house would have exploded anyway. It seemed that here, originally, Mr. Pena filed a complaint or claim with the city that said that the intruder did cause damage. And I'm wondering if there's a fact question here about inevitability and how much damage this intruder actually would have caused. So I think that when it actually comes to, like we only move for summary judgment on liability. If it actually came to damages, I think that's something that we would have to hash out. The city hasn't argued inevitable destruction or that there would have been more damage. And I think it's hard to make that case out because these toxic chemicals literally destroyed all of the electronics equipment there. It's hard to imagine that a fugitive who's running from the police would have done more damage than that. Well, what kind of damage was described in that original claim? I don't have the language of his initial claim right here, but I believe it was that when he climbed into... My understanding is that he damaged one of the printers because he stood on it when he climbed up into the ceiling to get away, but he wasn't in there trashing the place or anything. If he were in there trashing the place though, it might not be a taking, right? That's possible. And that would be a fact question. And it's something that the government would have to make out, but it would be a much narrower exception than what they're arguing for today. And the government hasn't argued here that the fugitive caused the damage that we're talking about here, except maybe a printer or something. No, that's right. Counsel, I apologize if you may have addressed this point during the power outage while I was briefly away. But I know that the Sixth Circuit recently addressed the search and arrest privilege in Slabaw versus Rutherford County, Tennessee. Do you think that the city's actions were covered by the search and arrest privileges recognized by the Sixth Circuit? I think they probably were. I think the problem though is that we can't find a historical basis for imputing these private privileges against tort liability to the government in taking these claims. Other than the Cedar Point dicta, if we're talking about the bare right to exclude, which was the only right at issue in that case. I guess the concern I have is that if we rule it in your favor, we would be creating a split with the circuits. Well, I think there's already a three-way split. The Fifth and the Sixth say that the Tenth Circuit's wrong. The Sixth says the Fifth Circuit seems to be wrong. So they all have different rationales here. And I think that the Supreme Court is, as of now, not satisfied with the amount of analysis that it has gotten from the lower courts. That's, I think, the takeaway from the Gorsuch-Sotomayor statement. So I don't think that just following the direction that these are going is really viable, both because there's not a consensus and because we have marching orders to take these cases seriously. Well, they have told us before that they're not averse to letting the Circuit Courts of Appeals stir the soup a little more before it's ready for dinner. The question is whether or not this is going to be the springboard that gets it back in front of them. That's all I have, Judge Frieden. Okay. Why don't we go to the other side and we'll still give you three minutes for rebuttal. Thank you. I think you're muted still. Yes. Thank you, Your Honors. Michael Walsh with the Los Angeles. I think the basic conflict here is between the well-established law regarding the enforcement of criminal laws and the law that plaintiff hopes to establish by judicial fiat. He refers a lot to the historical record, but there's not a single case in the entire history of the country holding that damages inadvertently caused by the enforcement of criminal laws constitutes a taking. Not one. In 200 years of jurisprudence, the closest he comes is an offhand comment by an intermediate court in New York, which does not rule on the issue, does not adjudicate the issue, but simply comments on that as a possible alternative remedy. There are no other cases. That's somewhat remarkable given 200 years of jurisprudence that no court has held this before. Council, what do you say to your friend's argument that Pompeii, when it talks about where real estate is actually invaded by super-induced additions of water, earth, sand, or other material, it's a taking? He said that's what happened here. Right. Clearly, Pompeii was talking about the physical occupation of land, the classic example of building a dam and flooding the backwaters, or building a highway, but forgetting to condemn the property you're building the highway on. Something like that, where you're physically occupying property in a way that essentially destroys the property rights of the owner. That's not this case. The property rights that Pena and the actual owner of the property, because Pena is a tenant, to the real estate hasn't changed. Personal property was damaged, but the Bedford case, the Supreme Court's made the distinction between the taking of property for public use and damages that are caused by government action. The first being within the takings clause, the second not. The government causes damages all the time that isn't part of the takings clause, and there's been no physical occupation of the property here. But I think it's important, and those cases come after the physical occupation cases you're talking about. Cedar Point is very much on point, and it's not dicta. The plaintiff likes to refer to that comment as dicta, but it very much goes to the basis for the court's holding and the scope of the court's holding in terms of why certain intruders in a property are takings and others are not. So that isn't dicta that your honor was referring to in Cedar Point. That's very much a of the scope of the basis for the holding. Counsel, if we were to rule in either your favor or your friend's favor, there could be broad rulings, there could be more narrow rulings, but if we were to hypothetically rule in your favor, would there be any need for us to go beyond based on the facts of this case, setting a principle that property damaged in the legitimate and reasonable exercise of the police power to try to capture a fugitive from justice is not a taking? Would there be any need for us to lay down in this case any broader rule than that or something like it? No, your honor. That's very much on all fours with this case, I believe, and there's no reason to expand beyond that. And I think this case actually gives the court an opportunity to harmonize the several circuit court opinions. I know that that plaintiff is trying to characterize these as conflicts between the Buckman and Baker and Slobog cases, but the fact is they all reach the very same conclusion that incidental harm, damage caused by the lawful and reasonable enforcement of criminal laws is not a taking. They all come to that conclusion. Counselor, one of the concerns that I have is that what happened to Mr. Pena, which was tragic, and I have a lot of empathy for him, nonetheless, I mean, we've got SWAT teams all over the circuit, and these sorts of entries are not uncommon when the police are chasing fugitives or dealing with a barricaded suspect or a hostage-taking situation. I understand that there's some sort of a state statute in California that addresses this issue. Can you enlighten me as to whether or not the city ever pays for damages caused by the police on these types of actions? I can't speak to cases in a broader sense, but I think Your Honor has exactly focused on what the solution to this issue is, is that there's a harm here, to be sure. Pena suffered a significant harm. In fact, all the plaintiffs in all the different circuit cases all suffered harms, often by strangers who forced their way into houses or to commercial establishments, but that doesn't make it a taking. That doesn't mean that property was public use. There's definitely an issue here that needs to be addressed, but it's not a judicial solution. There's a legislative or administrative issue here, and the efforts to address this problem should be done on that level. It seems like his claim was denied by the city. Do you understand why? I don't know the details of that claim. It was denied, that I know, but I don't know the details of those. That was long before I was involved in the case. I don't know the mechanisms of that. I'm sorry, go ahead, Judge Friedland. You started earlier by talking about how there is no case that ever said that this kind of conduct was a taking, but I don't know that. We only have a few cases saying the opposite, and most of them are recent, and I'm wondering if this is because Nick is recent, like maybe before Nick, people actually went through some process and got compensated by cities or states for this kind of damage. Am I right in understanding that that might be the difference here, that he didn't have to appeal the denial of the claim because of Nick, and now we have this new question that just isn't in the history at all? Well, I think the claims would have existed in any case. I don't know of any reason to think that the cities and counties in the country are dealing with these sorts of harms differently now than they were before. The remedy in that case might be different. Sorry, can I just make sure you understand my question? If there was a process to compensate people, then before Nick, people needed to go through that process and get the money somehow through an administrative process or a legislative process. Nick says you don't have to do that. You can come straight to federal court with your taking claim. So is that why there's no history in the cases either way on this issue? I don't think so, Your Honor, because I think if there's no reason to believe that cities and counties stopped paying because of that procedural change, that their policies in terms of compensation changed at all. There's no reason to believe that. So before that, there would be cases, they might be in state courts, but there would still be cases challenging the denial of claims. The cases don't necessarily have to be in federal court, although they might eventually get there. But there'd be claims somewhere. Can you find the state court cases that are saying, no, you don't get money for the police damage? I don't think we have cases either way here. I don't. I think what we have is the historical record that Baker and Slobaugh go through, that historically, these are not the types of things that constituted claims. And so you're right. There's not holdings in either direction. But what that means is when claims are denied, they didn't go anywhere or that people just understood that this was not something that was compensable. I mean, this goes back to even the YMCA case, which is 1969, which isn't so long ago, made the comment that, you know, when marshals break down the doors to foil a burglary they think is taking place, that's not a taking. That's that's the reasonable enforcement of criminal laws, whether they're right or wrong about the burglar. You may not know the answer to this, although I suspect given your job, you probably do. I doubt it's in the record. But a number of states, municipalities, et cetera, and at least this used to be the way it worked in the United States, but not since the passage of the Federal Tort Claims Act. There's some equivalent of private bills or resolutions to compensate in a circumstance where somebody might not be able to recover in a lawsuit. We have things like that in the state I live in. Is there any process that that ever goes through? For example, in the council in Los Angeles, even if somebody does not sue, they are still compensated through a resolution or an ordinance because the council believes that would be fair? That remedy is theoretically available. I don't know of it being employed, certainly not in this case. I know there is in California a state fund to compensate people who suffer harm at crimes, because typically often the criminal, while theoretically liable, has no assets. So there is a fund to compensate people who suffered harms at crimes in California. But that addresses the crime victim who basically doesn't have a realistic chance of recovering anything from an impecunious defendant. Right, which Peter says he is now. Yeah. And there's no evidence that he applied to that fund for reimbursement of all or part of his claim. I'm not aware of any application. Yeah, it's not in the record and I'm not aware if he did that. Okay. Yeah, I don't know that. But I do think it's going back somewhat to Judge Pennett's point about the potential scope of this holding. I think this is an opportunity to harmonize the many circuit cases. I don't think there's a conflict here. I think, for example, when you look at the Baker and Slobaugh cases, they articulate their rationale a little differently. Baker talks about a necessity privilege, but quite specifically doesn't talk about necessity in a broad sense, creates this subcategory of necessity just regarding the enforcement of criminal laws and addresses only necessity in that scope. Not surprisingly, that lands on all fours with the privilege that Slobaugh found in the historical record for the lawful search and arrest and the the same privilege. They come at it somewhat differently. They both cite a similar historical record supporting that privilege, supporting the enforcement of criminal laws and how damages that are inadvertently the result of that aren't takings. They might be damages, they might be subject to tort relief, they might be subject to some other kind of relief, but they're not a taking for public use. Similarly, the other cases, while there's language, there's some broad language when you cherry pick it out about a police power exception, every one of those cases, it's quite clear that the only police power they're talking about is the enforcement of criminal law. The Lee case, for example, and I think Bachman both vividly recognize the regulatory takings cases. They're not challenging those at all. Police powers in its broadest sense would include a regulatory taking, but that's not what these cases are talking about. These cases are only talking about the enforcement of criminal law. And to the extent some broader, some government claim that there is some broader police power that obviates the need for compensation, we would have no reason in this case to decide beyond at its broadest, law enforcement generally, and at its narrowest, the reasonable apprehension of a fugitive by using reasonable means. Right. Exactly, Your Honor. I think that's exactly what the issue this case presents. And frankly, I think that all the cases we talk about in our brief, that's the only issue those cases present. It's really just on those fours. Some of them use broader language at some point of the opinion, but based on the fact of the case and what they're addressing, it's clearly that's not the scope of the holding is much more limited. The Supreme Court, while it has not specifically addressed these facts, has provided the guidance for all these courts. The Cedar Point specifically talks about a privilege to enter and enforce criminal laws to affect arrest, which necessarily includes whatever violence is necessary to accomplish that arrest. Are you aware of any case, though, that in the process of entering for arrest, there was damage that was held not to be compensable under the Takings Clause? All the cases we cite in our brief, Your Honor. Backman, Bachman, Baker, Slobo. All right. Any Supreme Court case? No, no, no. The U.S. Supreme Court hasn't specifically addressed this issue. They provided some guidance that the YMCA, the Mugler and Cedar Point cases that the circuit courts have followed, but not specifically. No, they haven't specifically addressed it. And on that point, Your Honor, the dissent, I know that the plaintiff would like a lot of the dissent in the Baker case when the Supreme Court denied review. I think it's important to note that the court as a whole found no issue worth its time here. Well, it actually wasn't a dissent. Right. It was a comment, I guess. A statement on denial of a writ of certiorari. That's, yeah, you're right. I misspoke, Your Honor. But that, yes, that's what I'm referring to. But the court as a whole found no issue here worth its time, which could very well be the court's conclusion that there's already a consensus which requires no intervention. Two justices thought there was some interest here, but they talk about the necessity defense in a broader sense and are maybe not interested in the more narrow issue that's actually before this court. But in any case, that doesn't that doesn't get us anywhere. The court as a whole found nothing, nothing to see here. Have you forfeited the argument that the destruction was inevitable because the fugitive would have damaged this property? We haven't forfeited the argument, Your Honor. I think it's not necessary. The legal issue that's before the court doesn't doesn't get there. I think that creates a factual issue which we would have to get into in terms of who caused what damage. And to answer the court's question before on that, the initial claim talked about extensive damage by the perpetrator, destroyed a lot of shop. He described several different pieces of expensive equipments that were destroyed by the perpetrator and so forth. We didn't get into any of that because that raises factual questions as to what who caused what damage. And this was brought up on our 12b motion. So it's a legal issue. And we didn't want to get into the factual issue. But counsel, there's no dispute here that in terms of actual causation, the lobbying of the tear gas canisters, if I'm using the right term, et cetera, caused at least some of the damage that plaintiff is seeking recovery for. Yes, that's correct. Yes, sure. That's right. And as a result, there was no reason to get into the factual issues because the legal issue is already keyed up by the facts at hand. So that's your I mean, your opposing counsel's view of the legal issue is that there's a taking unless there's inevitable destruction. So if we were to agree with him, hypothetically, it seems like this question of what damage the fugitive would have caused would be relevant. But maybe you forfeited an argument to that effect. Well, it would only be relevant if the undisputed facts could show that he caused 100 percent of the damage. If there was some damage, but not as much damage. I don't know that the inevitability I mean, those cases really talk about an entire building being consumed by fire. And again, you've just conceded that there was that that there is at least some some quantifiable damage caused by the actions of the police. No, that's correct. And again, we're based on the allegations in the complaint that that's clearly alleged in the complaint. But that's that's, I think, fairly obvious. Yes. Well, Mr. Redfern, as I understand his argument is essentially pointing us to the chemicals within the tear gas canisters themselves that did the bulk of the damage. Well, I think he's referring to the actual I think he's just trying to dramatize the tear gas itself. Right. But I mean, basically, it ruined the printers and and the sensitive computer equipment and then got into the ceilings and so on. And he had to call in a hazmat team to to clear out the odor and so on that it leaves behind. Well, as I say, if we if we got to that state of the case, that would be a factual question. His initial complaint said that the perpetrator destroyed all the equipment. So there was nothing left to destroy in that regard. But that's not really the legal issue before the court. Now, we would only get into that if the court were to reverse and then we'd take it back to the court. But I think that the. I think the cases are fairly clear that his initial burden is to show that there was a taking for public use. And he hasn't met that burden. I think all the circuit court cases agree that under these circumstances, there is no taking there might there's there's certainly damage and there may well be a need for a legislative or administrative solution. But that doesn't justify redrafting the scope of the takings clause as it has been applied. Well, if we remanded for further factual development, even if the evidence showed that the fugitive was responsible for 25 percent of the damage, it still wouldn't answer the question of whether the city has to pay the remaining as the takings clause violation, which which is why we didn't raise the issue. The legal issue is the scope of takings clause is presented regardless. Yeah, based on your concession that at least part of the damage, if not all of it was caused by the tear gas project. Well, at least some of it, Your Honor. But yes. OK. I think one additional note that's worth making is that the California Supreme Court, as a matter of state law, has addressed this issue and held that as a matter of state law, under facts almost identical to Pena's third party perpetrator taking control of a commercial establishment and significant damage incurring as a result of trying to arrest and apprehend this person. As a matter of state law, the Supreme Court, the California Supreme Court held that there is no no takings claim here. There is no property interest that would support a takings claim that any recovery that might be made under state law would have to be through the Tort Claims Act insofar as there's any remedy at all. And that determination is based on the so-called emergency exception. Yes. Yes, that's correct. But I think it's important for two points. One is that the California Supreme Court, by referring to the Tort Claims Act, reemphasizes that the solution to this problem should be legislative, not judicial, that if there's a harm that needs to be addressed and there's policy considerations that need to be addressed in terms of impeding law enforcement by creating this financial burden on them whenever they act, even in an emergency situation, versus the harm by... Let me back up. So the problem with, in terms of policy, of imposing this sort of anytime anything gets harmed it becomes a takings clause, a takings claim. Because that means that anytime the police act at all, even no matter how reasonably, there's this veneer of potential financial liability which will inevitably change how they act. It will impede their ability to apprehend and stop serious public hazards because there will be this financial issue covering every single action by the police. This was one of the things the California Supreme Court's offices specifically talked about as one of the reasons why this was just unacceptable to make this a takings clause, a takings clause. But that kind of policy consideration in terms of how much to burden the police, what kind of financial issues should be involved, that is exactly a legislative process. That's the kind of balancing of different policy considerations and pluses and minuses that a legislature should consider, not through judicial fiat. This California Supreme Court, could you just give the site to the case you're talking about? Yes, Customer Co. v. City of Sacramento, 10 Cal 4368. It's in the last couple pages of our brief. Are you suggesting that that case defines the scope of property rights in California in a relevant way? Yes, well I'm inciting it as an additional case that came to the conclusion that there's no takings claim in this circumstance, along with all the other circuit cases. But I'm also saying that in so far as the takings claim, all property law is based in state law. There's no federal property, really. So in order for something to be taken, there has to be a right recognized by state law to be taken. And the California Supreme Court has held that under these circumstances, there isn't a property right to be taken. There might be a harm, maybe there should be a remedy, but that's a legislative issue. It's not within the property rights of the owner. We've taken both sides over. Does anyone have further questions on the panel? Since I'm over, unless there's any other questions, I'll submit. Thank you. Thank you. Let's hear three minutes of rebuttal. Thank you, Your Honor. Regarding the California Supreme Court, I think that argument would basically mean that there is no more federal takings law, that anytime a state court rejects a takings claim, there wouldn't be a property right as a matter of federal law. Then we wouldn't have cases like First English, where the Supreme Court rejected California's property rules under the takings clause. So I don't think there's any way to read that as controlling the scope of the right. If the opposite were true, it could theoretically mean that a state Supreme Court could say you have no right to be free from eminent domain as a property interest. And so somebody took it in a condemnation, you have no state law property interest, so you can't bring a takings claim. That's right, Your Honor. Under the Fifth Amendment. Correct. Regarding the history, Baker and Slabaugh, Slabaugh said that Baker's history appears to be wrong. Slabaugh's history isn't really about the issue in this case. There's a lot of history in the case, but it's all about whether there is this law enforcement privilege. And we agree that there's a law enforcement privilege against trespass tort liability, but they don't point to anything other than Cedar Point to make that link between the private tort defense and the governmental takings immunity. Regarding the victim fund, Mr. Pena did look into that. It's only available for personal injuries, so it's not for property damage. And then I think that this general rule that my friend is trying to create here, it's just not what these other courts have said. They over and over again are saying that this is a broad police power exception. If you look at LEC, they come from Mugler, which is basically a regulatory takings case. Now, of course, the facts of LEC were that this was law enforcement, but there's no reasoning in there that's specific to law enforcement. They just say as long as the state is acting for general health and welfare, that's going to be outside the takings clause. It would be one thing if they had reasoned narrowly, and then we were trying to argue that the implications of it were broad. But they're coming from a very broad rule and saying, and we conclude that the police power is part of, or sorry, that this law enforcement action was part of the police power. It wouldn't have had to do that move if it was reasoning the way that my friend is arguing. The same thing with the federal circuit in Amerisource. They actually define the police power as the full extent of the state's power in that case. If they really meant that we're just talking about what law enforcement does, then they wouldn't have had that language in there. And I think that if we then shift gears and talk about just a law enforcement exception, then we're stuck with the history again, and there just isn't anything there to support that. We don't have just one case on our side in New York. If you look at, in our brief, starting on page 48, we've got cases from New York, New Jersey, North Carolina, Georgia, Connecticut, South Carolina, and two cases from the U.S. Supreme Court, all of which reject a necessity exception to the Fifth Amendment. My friend doesn't have an answer to that. They don't have any history at all. They just have this rule that they're defining from other circuits, and I don't think that's enough under Arkansas Game and Fish, and I don't think that's what Justices Sotomayor and Gorsuch were asking for. None of those cases, though, rejected a necessity of criminal law enforcement like this, right? No, but I think that the explanation for that is that in the 19th century, criminal law enforcement activity wasn't causing tons of damage. The things that caused lots of damage were military actions and firefighting, and when those cases went to litigation, the plaintiffs were winning, if they could satisfy inevitable destruction and things like that. Bishop v. Macon, Georgia, in the 1840s, was not dicta. That's a case where the plaintiff won on one of these claims, and my friend doesn't have an answer to those cases. I think those are the closest cases. Thank you, both sides, for the helpful arguments in this very difficult case, and thank you again for appearing despite the tragic circumstances going on in L.A. Our thoughts go out to everyone who's affected. Thank you all very much. We are done for the day, so we are adjourned. Thank you. Thank you. Thank you, Aaron. The discord for this session stands adjourned.
judges: TALLMAN, FRIEDLAND, BENNETT